Robert L. TAYLOR, Plaintiff-Appellant,

v.

NASHVILLE BANNER PUBLISHING COMPANY, Defendant-Appellee.

Court of Appeals of Tennessee, Middle Section.

March 31, 1978.

Rehearing Denied May 16, 1978.

Certiorari Denied by Supreme Court Nov. 6, 1978.

Fyke Farmer, Nashville, for plaintiff-appellant.

James F. Neal and Jon D. Ross, Neal & Harwell, Nashville, for defendant-appellee.

## OPINION

DROWOTA, Judge.

This is an appeal by plaintiff, a public figure, from a summary judgment dismissing with prejudice his libel suit against defendant newspaper.

Plaintiff Robert L. Taylor is a well-known attorney, a former Chancellor, and a former judge of the western section of this Court. He once unsuccessfully sought the Democratic nomination for governor of Tennessee. In the spring of 1974, he was an active candidate for the Democratic nomination to the Supreme Court of Tennessee. Defendant Nashville Banner Publishing Company (Banner), one of two daily newspapers in Nashville, published two articles containing material allegedly defamatory of plaintiff on May 30 and May 31, 1974. The articles dealt with events surrounding the selection of Democratic candidates for the Supreme Court.

The Tennessee Supreme Court is composed of five judges, "of whom not more than two shall reside in any one of the grand divisions of the State." Tennessee Constitution Art. 6, § 2. Supreme Court judges are to be "elected by the qualified voters of the State" according to such rules as the legislature prescribes. Tennessee Constitution, Art. 6, § 3. Article 6, § 5 of the State Constitution provides that the judges of the Supreme Court shall appoint the Attorney General of the State. By tradition, the Attorney General is appointed from the one grand division, east, middle, or west, that is represented by only one Supreme Court judge.

At one time, judges of all the appellate courts of this State were chosen by means of a merit selection plan. This plan, set out in T.C.A. §§ 17–701—17–716, provides for the governor to fill judicial vacancies by appointing one person from a group of three recommended by the appellate court nominating commission, a body established by the statute. The appointee then appears on the next general election ballot to be accepted or rejected by the voters on a "yes/no" basis. While this system still ap-

plies to intermediate appellate courts, the legislature in 1974 excepted the Supreme Court judges from its operation. The result is that Supreme Court judges are selected in popular, contested elections much like holders of political offices in the executive and legislative branches of government.

In the spring of 1974, the State's political parties were anticipating the election of Supreme Court judges to be held in August of that year. The Tennessee State Democratic Executive Committee, which was to choose its party's five nominees for the Court, had scheduled a meeting in Nashville for that purpose for June 1, 1974. The Committee had received from a special Judicial Selection Commission the names of eight people recommended as qualified for the Court. Plaintiff Taylor's name was not one of the eight names submitted. The Executive Committee was not absolutely bound to choose its five nominees from among the eight recommended, however, and plaintiff remained an active candidate.

In the context of this political nominating process, the Banner published the first story of which plaintiff complains on May 30, 1974. The gist of the story was that a great deal of political maneuvering was occurring in Democratic ranks with respect to the Supreme Court nominations. In the part of the story particularly complained of by plaintiff, and alleged to be defamatory of him, it is stated that plaintiff was actively seeking the nomination, "possibly by working a deal with the liberal element of the executive committee whereby . . . Russell Sugarman, a black, would be made attorney general" if plaintiff were nominated to the Court. The entire article is reprinted in an appendix to this opinion, and is further discussed below.

On May 31, 1974, the day before the Executive Committee meeting, the Banner published the second article of which plaintiff now complains. The article told of bribery charges lodged with the District Attorney General in Nashville by a member of the Democratic Executive Committee. The Committee member, it was reported, "said an attempt was made this week to

'buy my vote' for Memphis Attorney, Robert Taylor" by an unidentified man and woman. The article went on to describe in detail the attempted bribe, the Committee member's refusal, and her filing of a statement with District Attorney General Shriver, who was said to be investigating the matter. The entire article is reproduced in the appendix to this opinion.

At the June 1 meeting, the Executive Committee chose its five nominees from the list of eight recommended. Plaintiff was not one of the five chosen. All five Democratic candidates were successful in the August election, and they constitute our present Supreme Court.

On May 27, 1975, plaintiff brought the instant libel suit against the Banner in Davidson County Circuit Court, alleging that the articles of May 30 and 31, 1974, defamed him. Plaintiff claimed in his complaint that the articles injured his reputation and resulted in his failing to get enough Executive Committee votes for nomination. He asked $500,000.00 in compensatory and punitive damages. The complaint was amended, in March of 1976, to allege that the articles were published "maliciously," that they were "calculated by the defendant to injure plaintiff's candidacy for nomination," and that they "did produce actual damages to the plaintiff by causing him to fail to secure enough votes."

Defendant Nashville Banner took the position that the constitutional privilege first established in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), applied, and that there was no evidence of "actual malice" as defined in that case. On October 8, 1975, defendant filed its motion for summary judgment. Two grounds for dismissal were asserted: (1) that the language complained of is unambiguous and not defamatory; and (2) that there is no genuine issue of material fact on the issue of actual malice. In support of its motion, defendant attached certain affidavits and depositions. The depositions were ones taken early in 1975 in the case of *Taylor v. Tennessee State Democratic Executive Committee*, a suit brought

by plaintiff in the Chancery Court for Shelby County. Because it perceived the case as a serious and unusual one, the trial court permitted the parties to engage in very extensive discovery over a long period of time before ruling on the summary judgment motion. Further discovery consisted in large part of new depositions, including fresh testimony from some of those whose depositions in the Chancery case had already been submitted.

On January 5, 1977, the trial court filed a lengthy memorandum opinion in which it sustained defendant's motion for summary judgment on all grounds as to both articles. The opinion contains an orderly and thorough presentation of the facts, and an accurate and extensive discussion of applicable law. It also embodies the court's conclusion that the articles in question are not defamatory of plaintiff, and that there is absolutely no evidence to indicate that plaintiff could prove that defendant published them with "actual malice" within the meaning of *New York Times Co. v. Sullivan, supra.* In accordance with this opinion, the court on January 7, 1977, entered an order granting defendant's motion for summary judgment and dismissing the case. Plaintiff has appealed.

Plaintiff has raised five assignments of error in this Court. In the first, plaintiff complains of the trial court's conclusion that the articles are not defamatory of him. In the second assignment he disputes the conclusion that there is no genuine issue of material fact on the question of actual malice. In the third assignment plaintiff alleges that the trial court erred in refusing to allow him to amend his complaint, while in the fourth he complains that the trial court improperly weighed the evidence and determined the credibility of the witnesses. In the fifth assignment of error plaintiff simply avers that the trial court erred in granting summary judgment. We will examine the May 30 article in the light of the first two assignments of error, and then proceed to treat the May 31 article in the light of the same two assignments. Finally, we will examine plaintiff's third, fourth and fifth assignments of error.

Summary judgment is to be rendered by a trial court only when it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." T.R.C.P. 56.03. The summary judgment procedure is not to be regarded as a substitute for trial of disputed factual issues. *Evco Corp. v. Ross,* 528 S.W.2d 20 (Tenn. 1975); *Layhew v. Dixon,* 527 S.W.2d 739 (Tenn.1975). The party who moves for summary judgment has the burden of showing that no genuine issue of material fact exists, and in ruling on the motion the court must view the record in the light most favorable to the motion's opponent. *Lucas Brothers v. Cudahy Co.,* 533 S.W.2d 313 (Tenn.App.1975). With this standard in mind, we turn to the merits of plaintiff's appeal.

### THE ARTICLE OF MAY 30 1974

In his first assignment, plaintiff contends that the trial court erred in concluding that the article of May 30, 1974, is not defamatory of him. Plaintiff points especially to the sixth paragraph of the article. The first six paragraphs read as follows:

Intense political maneuvering that has been termed by one insider as "a hell of a lot of dealing" may determine the nominations for the State Supreme Court.

Jockeying, dealing and political pressure are all part of the picture as candidates are attempting to be selected by the State Democratic Executive Committee for the five slots on the ticket for the high court.

The 36 member committee meets here Saturday to narrow a list of eight candidates recommended by the Judicial Selection Commission to five nominees.

But there are some other persons with hats in the ring. And through these persons, deals are being discussed. A "package deal" coming out of West Tennessee focuses on the state attorney general position as being the pawn that could push one candidate onto the ticket.

Indications from Memphis are that former chancellor Robert L. Taylor is attempting to get enough votes to overthrow the recommendation of Justice William H. D. Fones.

Taylor is actively seeking the nomination possibly by working a deal with the liberal element of the executive committee whereby Judicial Selection Commission member Russell Sugarman, a black, would be made attorney general if a "slate" is selected including Taylor.

Plaintiff's primary argument is that the article charges him with a crime, which of course would make it clearly defamatory. Plaintiff alleges that the article charges him with the crime of bribery, citing T.C.A. § 2–1927. It is doubtful, but arguable, that the conduct attributed to plaintiff by the article is proscribed by that statute.

Furthermore, although plaintiff has not raised the point, this Court recognizes that the May 30 article may easily be understood as charging that plaintiff was guilty of conduct contrary to accepted and published standards of conduct for candidates for judicial office. During May, 1974, the conduct of judges and candidates for judicial office was governed by Rule 38 of the Supreme Court of Tennessee, which then read in part as follows:

The ethical standards relating to the administration of the law in this Court, shall be the Canons of Judicial Ethics of the American Bar Association now in force, and as hereafter modified or supplemented.

Candidacy for judicial office was specifically governed by Canon 30 of the Canons of Judicial Ethics of the American Bar Association, which read in pertinent part:

A candidate for judicial position should not make or suffer others to make for him, promises of conduct in office which appeal to the cupidity or prejudices of the appointing or electing power . . . and he should do nothing while a candidate to create the impression that if chosen, he will administer his office with bias, partiality or improper discrimination.

It may be that the May 30 article in effect charges that plaintiff violated this ethical provision by promising to support and vote for Mr. Sugarman as Attorney General if plaintiff were nominated and elected to the Supreme Court. If so, this is a powerful argument in favor of the conclusion that the article is defamatory.

On the other hand, it could be argued that the article must be considered in the context of the politics surrounding major party nominations for high state office, a context clearly delineated in the article as a whole. It is not customary to consider judges and candidates for judicial office in the context of such partisan politics. The judicial function is to interpret and apply the law and to administer justice in a manner that is independent of all considerations save fairness and logic. It is primarily for this reason that the conduct of judges is restricted by many rules, such as the Canons of Judicial Ethics referred to above, which do not bind those in the legislative and executive branches, the function of whose members is to formulate into law and carry out the subjective wishes of the people who elect them. Nevertheless, partisan politics is the context in which candidates for the Supreme Court in 1974 were placed by the use of a "popular election" as the selection process for Supreme Court judges. In such a political context, the disgrace involved in the type of "dealing" attributed to plaintiff in the May 30 article is arguably less than would otherwise be the case with a candidate for judicial office under the "merit" form of selection. This is particularly true when, as here, the alleged deal involved the selection of Attorney General, which is in the nature of an administrative rather than a judicial function of the Supreme Court.

Of the three members of this panel, Judge Todd feels strongly that the May 30 article is defamatory, primarily on the ground that the article in effect charges plaintiff with violating Canon 30, *supra*. Contrary to the statements in his separate concurring opinion, however, the other two members of this panel neither condone vio-

lations of the Code of Judicial Conduct nor would we be unwilling to condemn such violations in a proper case. In this case we simply feel that since the trial court's judgment in defendant's favor must be affirmed with regard to the May 30 article on the issue of actual malice, discussed next, it would serve no useful purpose to reach a conclusion on the issue of whether that article is defamatory. Accordingly, we pretermit any further discussion of the facts or law related to this issue.

Plaintiff's next argument is that the trial court erred in concluding that there exists no genuine issue of material fact on the question of whether defendant published the May 30 article with actual malice. We disagree. We hold that, due to the absence of competent evidence that the May 30 article was published with actual malice, defendant's publication of it is protected by constitutional privilege.

Constitutional privilege was first articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), wherein the Court held that a plaintiff who was a public official could not recover for defamatory statements relating to his official conduct unless he could prove that they were published with "actual malice," defined as knowledge of the statements' falsity or reckless disregard for whether they are false or not. 376 U.S. at 279–80, 84 S.Ct. 710. This rule, based on the First Amendment guarantees of free expression, was soon extended to apply to public figures who are not public employees in cases such as *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The Court has defined "reckless disregard" as a "high degree of awareness of probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). In this regard, the Court has also stated that

> [t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

In the instant case, plaintiff does not deny that he is a public figure for purposes of the *New York Times* doctrine. Rather, he argues that the inconsistent depositions of Will Cheek, when viewed in the light most favorable to him, raise an issue of material fact as to actual malice.

It was the testimony of both Ken Morrell, defendant's editor, and Ed Long, its reporter, that Will Cheek, the Secretary of the State Democratic Executive Committee, was the only source for the May 30 article's connection of plaintiff with a "deal" involving the office of Attorney General. The record contains two depositions of Cheek's, one taken on January 14, 1975, and the other on April 1, 1976. In the first deposition, Cheek categorically denied that he passed on to anyone a rumor that plaintiff was involved in such maneuvering as the article reported, stating that he did not believe that plaintiff was so involved. In the second deposition, taken more than a year later but after discussions with several people had allegedly refreshed Cheek's recollection, Cheek testified that he had "speculated" about plaintiff to Ken Morrell, defendant's editor, along the lines reported in the article.

Plaintiff would have us allow for the possibility that a jury might believe only the statements in Cheek's first deposition to the effect that he never told defendant that plaintiff was involved in a "deal." Believing that, plaintiff argues, a jury could then disregard the additional testimony of Morrell and Long and conclude that defendant had no source at all for the May 30 article. On this conclusion, says plaintiff, a finding of actual malice might be predicated. This position, however, overlooks legal authority of long standing in Tennessee.

It is a rule of law in this state that contradictory statements of a witness in connection with the same fact have the result of "cancelling each other out." *De-Grafenreid v. Nash. Ry. & Lt. Co.*, 162 Tenn. 558, 39 S.W.2d 274 (1931); *Johnson v. Cincinnati N. O. & T. P. Ry. Co.*, 146 Tenn. 135, 240 S.W. 429 (1922); *Donaho v. Large*, 25 Tenn.App. 433, 158 S.W.2d 447 (1941);

*Southern Motors, Inc. v. Morton,* 25 Tenn. App. 204, 154 S.W.2d 801 (1941); *Nashville & American Trust Co. v. Aetna Cas. & Sur. Co.,* 21 Tenn.App. 366, 110 S.W.2d 1041 (1937).

The question here is not one of the credibility of a witness or of the weight of evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies; but if the proof of a fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way.

*Johnson, supra,* 146 Tenn. at 158, 240 S.W. at 436. As can be seen from the quoted paragraph, this rule of "cancellation" is usually stated as applying only when the inconsistency in the witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence. In the instant case, the inconsistency in Cheek's testimony is explained by his re- freshed recollection. The testimony in his second deposition is corroborated by that of Morrell and Long, while the testimony of his first deposition is uncorroborated. Thus, there exist both explanation and cor- roboration, but both point in favor of the veracity of Cheek's second deposition, the existence of a reasonable source for the article, and the absence of an issue of mate- rial fact with regard to actual malice.

■ Under these circumstances, a jury could not be permitted to credit the first deposition of Cheek to the exclusion of all the evidence conflicting with it. To apply the rule of *Johnson, supra,* and disregard the inconsistent testimony of Cheek *in toto* is to view the evidence in a light as favor- able to plaintiff as the summary judgment standard requires, and perhaps more so. Disregarding Cheek's inconsistent testimo- ny, we are left with the testimony of Mor- rell and Long that Cheek related to defend- ant the substance of the story it published

about plaintiff and the Attorney General "deal." With the only evidence indicating that the source of the story was the Secre- tary of the State Democratic Executive Committee, there is no doubt that there exists no genuine issue of material fact as to whether defendant published the May 30 article with knowledge of its falsity or with such reckless disregard for its truth or falsi- ty as to constitute actual malice.

Since a proper view of the evidence re- veals no support for the proposition that defendant published the May 30 article with actual malice, it follows that the trial court was correct in granting summary judgment in defendant's favor with regard to the libel claim based on that article.

## THE ARTICLE OF MAY 31, 1974

■ Rather than reporting possible polit- ical "deals" connected with the Democratic nominations for the Supreme Court, the May 31 article discusses the much more serious matter of bribery. The thrust of the article, reproduced in its entirety in the appendix to this opinion, appears in its ini- tial paragraph:

A member of the State Democratic Ex- ecutive Committee today said an attempt was made this week to "buy my vote" for Memphis Attorney Robert Taylor in Sat- urday's committee election for State Su- preme Court nominees.

The article goes on to report that the Com- mittee member was approached by two peo- ple who offered her "financing" if she would vote for plaintiff, and that she had informed the District Attorney General, who was investigating.

Again, plaintiff's first argument is that the trial court was wrong to conclude that this article is not defamatory. We cannot agree with plaintiff. It is true that the article clearly and unambiguously reports charges of bribery. But, just as clearly, those charges are not levelled at plaintiff. The article says that two people tried to buy a vote *for* plaintiff, not that plaintiff tried to buy a vote. In the context of the article, which nowhere even intimates a

connection between plaintiff and the two unnamed persons who attempted the bribe, the quoted paragraph can only mean that a vote in favor of plaintiff was attempted to be bought, not that plaintiff was behind the attempt. This certainly cannot be construed as a defamation of plaintiff.

■ Moreover, defendant is clearly protected by constitutional privilege here. Again, plaintiff does not deny that he is a public figure for purposes of the *New York Times* doctrine. The trial court found that there was no issue of material fact on the question of actual malice, and we agree.

There is no question that a member of the Executive Committee went to District Attorney General Shriver with allegations of attempted bribery against two people, as the May 31 article reported. The record shows that defendant obtained information about these charges from Shriver himself. The existence of the allegations and the investigation is clearly documented. It is equally clear that the gist of the allegations made to Shriver was that someone had attempted to pay a member of the Committee to vote in favor of plaintiff's nomination. Indeed, the evidence unequivocally supports not only the proposition that the published report of the allegations was true, but also the proposition that the allegations themselves were entirely true. Thus, defendant might well be entitled to an absolute defense at common law because of the truth of the matter published. At the very least, the substantial veracity of the May 31 article combined with the highly credible nature of its main source, the District Attorney General, supports the trial court's conclusion that, as a matter of law, plaintiff could not prove "actual malice" in the sense of *New York Times* and its progeny.

We hold that defendant's publication of the May 31 article was constitutionally protected as a matter of law because of the absence of any issue of material fact with respect to actual malice. The trial court's grant of summary judgment was correct, and must be affirmed on this basis. Our conclusion renders it unnecessary for us to consider plaintiff's rather lengthy arguments on other matters, such as the applicability of the non-constitutional privilege to publish comments on official proceedings.

## ASSIGNMENT OF ERROR III

Plaintiff contends that the trial court erred in refusing to allow him to amend his complaint. The record shows that plaintiff did amend his complaint once by leave of court in March 1976, as we have noted above. The subject of this assignment of error, however, is a motion which plaintiff filed November 5, 1976, and which simply says, "The plaintiff Robert L. Taylor moves for leave to amend his complaint in this case." The substance of the proposed amendment is not attached, nor does it appear in the record at all until the very end, where it is attached to plaintiff's petition to rehear. Nowhere in the record is there a ruling of the trial court on the motion. The transcript of a hearing held on another motion on November 12, 1976, contains reference to a motion to amend by plaintiff, but again the substance is lacking and no ruling appears.

■ In these circumstances, it would be impossible for this Court to reverse the trial court for failing to allow the amendment, even if it were clear that the court did fail to do so. Unless the record before us shows the substance of a proposed amendment and that it was filed in the trial court, we cannot determine what was before that court or whether the court acted properly on the motion to amend. The proper way to request the court for leave to amend under Rule 15 is to attach a copy of the proposed amendment to the motion so that it becomes part of the record at that time, regardless of what action the trial court takes or fails to take on it. This procedure ensures that the appellate courts know exactly what amendment the trial court was asked to allow. It is only with such knowledge that the trial court's decision can be reviewed.

■ Even assuming that the amendment appearing in plaintiff's motion to rehear was before the trial court as plain-

tiff contends, however, plaintiff has not been prejudiced in regard to it. First, while the trial court never expressly ruled on the motion to amend, the memorandum opinion indicates that the amendment was not denied but was considered by the court. The memorandum states that "[e]very indulgence has been allowed the plaintiff, including amendments to the complaint . . . ." (emphasis added). Since only one amendment, which was allowed, appears in the record, the inference is that the trial court considered that plaintiff's second motion to amend had been granted.

In addition, plaintiff would not have been unfairly prejudiced even had his second motion to amend been denied. The material factual allegations of the second amendment, as it appears in the petition to rehear, were already at issue. In the final paragraph of the proposed amendment, it is stated that defendant intentionally made false statements knowing they would injure plaintiff's chances of being nominated, and that the statements did result in his failure to be nominated. This can be construed, at most, as an attempt to plead a cause of action in the nature of intentional interference with prospective advantage. This is the same construction that was placed on plaintiff's *first* amendment by defendant's amended motion for summary judgment, and the trial court expressly rejected such a cause of action in its memorandum opinion. Since the substance of plaintiff's proposed second amendment to his complaint was pleaded and considered, his case could not have suffered from denial of his second motion to amend had the trial court denied it.

At this point, we note our agreement with the trial court's grant of summary judgment in defendant's favor on the cause of action for intentional interference with prospective advantage. Plaintiff has presented no evidence to raise an issue of material fact on any of the elements of that tort in the instant case. See Prosser, *supra*, § 130. He has cited no authority in support of this cause of action, nor even any to show that such a tort is recognized in Ten-

nessee. Further, insofar as we have held that the First Amendment protects defendant against a charge of libel in this case, it would also protect defendant against liability for this tort. Summary judgment was properly granted on this cause of action.

## ASSIGNMENT OF ERROR IV

In this assignment, plaintiff contends that the trial court weighed the evidence and determined the credibility of witnesses, neither of which may properly be done in considering a motion for summary judgment. The only conflict in the evidence that is even arguably material, and the only evidence that could have been weighed or evaluated on the basis of credibility is the inconsistencies in the two depositions of Will Cheek. These inconsistencies involve what Cheek, one of the sources for the May 30 article, told the Banner in connection with that article. We have already decided, however, that the most favorable view to plaintiff that we could possibly take of Cheek's inconsistent testimony is to disregard it altogether. This decision, fully explained above in our discussion of the issue of actual malice in the publication of the May 30 article, means that it is irrelevant whether or not the trial court weighed Cheek's inconsistent evidence on the issue of actual malice in the publication of that article. In no other instance could the trial court have weighed evidence or gauged credibility, for in no other instance was there any material evidentiary inconsistency capable of being so resolved. We hold that the trial court followed proper summary judgment procedure on all issues which have been discussed, and on which its decisions have been affirmed, in this opinion.

## ASSIGNMENT OF ERROR V

Finally, plaintiff alleges that the trial court erred in granting defendant's motion for summary judgment and dismissing the case. For the reasons stated in this opinion we disagree, and affirm the judgment of the trial court.

Affirmed.

TODD, J., concurs in a separate opinion.

BLACKBURN, Special Judge, concurs.

## APPENDIX A

*May 30, 1974 Nashville Banner Article*
### INTENSE DEALING COULD INFLUENCE COURT PICKS

By ED LONG

Intense political maneuvering that has been termed by one insider as "a hell of a lot of dealing" may determine the nominations for the State Supreme Court.

Jockeying, dealing and political pressure are all part of the picture as candidates are attempting to be selected by the State Democratic Executive Committee for the five slots on the ticket for the high court.

The 36 member committee meets here Saturday to narrow a list of eight candidates recommended by the Judicial Selection Commission to five nominees.

But there are some other persons with hats in the ring. And through these persons, deals are being discussed. A "package deal" coming out of West Tennessee focuses on the state attorney general position as being the pawn that could push one candidate onto the ticket.

Indications from Memphis are that former chancellor Robert L. Taylor is attempting to get enough votes to overthrow the recommendation of Justice William H. D. Fones.

Taylor is actively seeking the nomination possibly by working a deal with the liberal element of the executive committee whereby Judicial Selection Commission member Russell Sugarman, a black, would be made attorney general if a "slate" is selected including Taylor.

East Tennessee has for years been the division with only one justice and the attorney general. The Supreme Court selects the attorney general.

The committee is composed of 18 men and 18 women. It is reported that Nashville lawyer Bonnie Cowan is seeking to get the support of the women of the committee.

Three of those recommended by the Selection Commission obviously will not be nominated, but it may be because they have been "cut out" of a deal.

State Sen. Ed Gillock of Memphis, who appeared before the commission as a candidate for the high court and was not recommended, reportedly said there is such a deal being made among committee members.

Gillock said that he is running for the Supreme Court nomination. He is busy contacting committee members to attempt to get their votes. "The situation is very, very fluid at this time and that's all I can say," the senator said.

One member, Ronald Borod, was targeted as the force behind Fones.

A Memphis lawyer and member of the committee, he said today, "I'm not interested in any deals or trading. I'm a supporter of Justice Fones and I'm interested in the other four seats.

"I'm not part of any move and I don't know about such a move."

Borod is a former law partner of Fones. He said that the justice is "trying to meet personally with the committee members."

### Choose Slate

Sen. William Peeler, Waverly, said, "I think there's going to be an effort made to choose a date (sic) of candidates the panel selected.

"There will also be some candidates that will run who were not recommended by the commission. I would expect Bob Taylor would run regardless of what the commission did."

About the possibility of a deal between the candidates to also place a sixth person into consideration who would be named attorney general if a "package" was selected, Peeler said, "There's been some discussion along those lines. I don't know how serious the discussions have been."

The veteran lawmaker indicated that the candidates may be more interested in securing their own nominations than in selecting the attorney general.

Will Cheek of Nashville, secretary of the committee, said "I haven't seen a block vote or 'slate' happen yet and I don't think it will because of the interpersonal relationship among committee members." He did say that all of the candidates had called him and sent letters to him as well as other members.

"Judges are aware that this type of dealing is illegal, not to mention unjudicial," Cheek said.

### Method of Balloting

Gilbert S. Merritt, Jr., the legal counsel for the Judicial Selection Commission, and Cheek both said that the problem the committee will face Saturday will be in the method of balloting.

The committee will choose a nominee from each of the state's three grand divisions and two at-large candidates.

Merritt indicated that the order in which the candidates are chosen could be extremely important.

Two of the nominees said earlier this week that the important question will be the number of nominees from East Tennessee, which has traditionally only been represented by one justice. With three candidates, it may be that that section of the state will receive two justices in this election.

With only two candidates from West Tennessee, some observers have said that either Fones or Chief Justice Dyer will be dropped from the ticket if a "deal" is consummated.

The chairman of the Judicial Selection Commission, former Vanderbilt Law School Dean John Wade, said today, "I gather there has been some discussion" about the voting Saturday.

"It is not impossible for the candidates to get together but the members of the State Executive Committee would react adversely," Wade said.

In addition to Fones, Dyer and Cowan, those being considered are Nashville lawyer William Harbison, Chattanooga Chancellor Ray Brock, Pulaski lawyer Joe Henry, and Courts of Appeals Judges Charles O'Brien of Crossville and Robert Cooper of Knoxville.

*May 31, 1974 Nashville Banner Article*

*Democratic Committeewoman Tells of Attempt to Influence High Court Vote*
### SHRIVER PROBING BRIBE TRY

By LARRY BRINTON

A member of the State Democratic Executive Committee today said an attempt was made this week to "buy my vote" for Memphis Attorney Robert Taylor in Saturday's committee election for State Supreme Court nominees.

The charge was leveled by Mrs. Helen A. Brown, of 1811 Beech Ave., and a detailed probe has been launched into the allegation by the staff of Dist. Atty. Gen. Thomas Shriver.

The State Democratic Executive Committee member said the alleged bribe attempt was made Tuesday at her home by a man and woman, whose names she could not recall, but could identify.

"How much financing would it take to get your vote," Mrs. Brown said the man asked after she told him she had not made up her mind as to whom she would vote for Saturday and he allegedly had suggested she vote for Taylor as one of five Democratic nominees.

"My vote is not for sale," the woman said she replied. Mrs. Brown said the answer "irritated" the woman, about 55 years old, who had originally telephoned her on May 23.

### Election to Continue

James Sasser, chairman of the State Democratic Executive Committee, said the election will continue Saturday as planned.

"We plan to continue our meeting as planned and to nominate our Supreme Court justices," Sasser explained "I think this sort of attempt to influence voters is reprehensible, and shocking and I think Mrs. Brown is to be congratulated for coming forward."

The committee chairman said the nominees must be certified before the June 6 Democratic Primary election and the election must be held Saturday as planned.

Meantime, Shriver said his investigators began the probe this morning.

"We can't anticipate how long the investigation is going to take, but I doubt seriously it will be completed by Saturday," he commented.

The district attorney said he believed his investigators had learned the identity of the woman and expect to learn from her the man's identity.

Taylor could not be reached for comment. His Memphis law firm reported he was in Nashville for the weekend.

### First Contact May 23

Mrs. Brown, serving her first term on the executive committee, said the woman had first contacted her by telephone May 23 stating she wanted to discuss the Davidson County Democratic Executive Committee with her.

"She said she wanted to talk to me about the election of a chairman for the county election committee and she said she also wanted to feel me out on some of the candidates that are coming up for the court nomination," Mrs. Brown told the Banner.

After discussing politics for a few minutes on the telephone, Mrs. Brown said it was agreed that the woman, who identified herself to the committeewoman, would visit Mrs. Brown said, referring to the continue the conversation.

"She came Tuesday, but she didn't say she was going to have anyone with her," Mrs. Brown said, referring to the man who told her he worked at the Metro Courthouse.

"She introduced herself, but I'm not very good on names," she commented. "He introduced himself, also."

"We talked about the county executive committee and she said she didn't like the way things were being run, that people were telling you how to vote and who to vote for," Mrs. Brown recalled.

"I said that politics is kind of dirty and gets nasty sometimes," she added. It was then, Mrs. Brown said, that the unidentified man began naming some of the nominees for the justice posts on the State Supreme Court.

"They asked me who I was in favor of," she said. "I said nobody in particular right now and that my mind was not really made up since I had until Saturday morning to reach a conclusion.

"This man spoke up and said 'how do you feel about Taylor? I feel like he's the man for the job.' "

### Taylor Discussed

Mrs. Brown said she told the couple that she didn't favor Taylor over any of the other candidates.

"He said Taylor had done so much for the blacks in the Civil Rights movement." The committee member said they then discussed Taylor's role as chairman of Alabama Gov. George Wallace's Tennessee presidential campaign bid.

"That's when he asked me 'How much financing would it take to get your vote', Mrs. Brown stated. After stating she wouldn't sell her vote, she said the man said, "I don't want to pressure you, but I wish you would think about it."

After turning down the alleged bribe attempt, Mrs. Brown said, the man "sort of smiled and tried to approach me at a different angle, but the woman called me 'hard-headed' and 'stubborn'."

Mrs. Brown said the man telephoned her Thursday, again identified himself, and inquired if she had changed her mind. The woman said she answered that she still had not decided how she would vote Saturday.

Mrs. Brown later contacted her attorney, Gilbert Merritt, who took a statement from her and turned it over to Shriver.

Taylor was one of a flock of democrats who sought recommendation to the State Supreme Court by a special commission named by the Democratic Executive Committee.

The commission recommended eight persons, from which the executive committee can nominate five. Taylor was not one of the eight, but he still hopes to be one of the five nominees.

In its meeting Saturday, the executive committee is under no obligation to choose from the eight people recommended by the special commission.

Committee members privately have confided that the political infighting and dealing for the five posts have been fierce.

TODD, Judge, concurring.

Although the majority opinion mentions my views on the impropriety of the actions alleged in the May 30, 1974, article, I am disappointed that my colleagues are unwilling to join me in unequivocally condemning actions prohibited by the prescribed ethical standards for the bench and bar.

The Code of Professional Responsibility adopted by the American Bar Association and by the Supreme Court of this State prior to May, 1974, provides:

"D.R. 8–103, *Lawyer Candidate for Political Office.* A lawyer who is a candidate for judicial office shall comply with the applicable provisions of Canon 7 of the Code of Judicial Conduct."

The Code of Judicial Conduct promulgated by the American Bar Association states:

"B. Campaign Conduct.

(1) A candidate . . . for judicial office . . ."

. . . . .

. . . . .

(c) should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of his office."

The article of May 30, 1974, charged plaintiff with violating the provisions just quoted.

The import of the article was not merely that plaintiff offered a promise of "support" for a candidate for Attorney General. Due to the fact that the Attorney General was to be elected by the members of the Supreme Court, the promise of "support" by necessary inference included the promise of the *vote* of plaintiff as a sitting justice of the Supreme Court.

I cannot agree that the violation of the quoted provision of the Code of Judicial Conduct is permissible activity for a judicial candidate "in the context of the politics surrounding major party nominations." Such conduct is prohibited, wrong, and disgraceful. It is proper grounds for discipline of a lawyer and removal of a judge for misconduct. This Court should not condone it as permissible.

Such conduct being as previously characterized, the imputation of such conduct is of necessity libelous.

I challenge this Court and the Supreme Court to declare in ringing and decisive tones that, regardless of the method of selecting judges, the prescribed standards of professional and judicial conduct are mandatory at all times and that there is no holiday from them during an election season.

Nevertheless, I am willing to accept the conclusion of the majority regarding the article of May 30, 1974, on the ground that the record fails to disclose any grounds of malice, knowledge of falsity, or reckless disregard of truth.

As to the May 31, 1974, article, I concur fully with the majority opinion.

OPINION ON PETITION TO REHEAR

DROWOTA, Judge.

Plaintiff Taylor has filed a brief petition to rehear in which he asks how this Court can ignore the first deposition of Will Cheek and "import absolute verity" to the second. We think it clear from the principal opinion, however, that we did not view Cheek's depositions in this way. Rather, we assumed that his inconsistent statements had the effect of "cancelling each other out," which left us with the testimony of Morrell and Long that Cheek was their source for the disputed statement in the article of May 30, 1974. Our approach to

this issue has been fully explained in the principal opinion and will not be further recapitulated here.

The petition to rehear is respectfully denied.

TODD, J., and BLACKBURN, Special Judge, concur.