IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 4, 2016 Session

**STATE OF TENNESSEE v. BRIAN LACKLAND**

**Appeal from the Criminal Court for Shelby County**
**Nos. 12-06020, 12-06021   Chris Craft, Judge**

_____

**No. W2015-02313-CCA-R3-CD  -  Filed January 18, 2017**

_____

Defendant, Brian Lackland, was indicted by the Shelby County Grand Jury in two separate indictments for aggravated robbery, aggravated burglary, attempted first degree murder, aggravated assault, and employing a firearm during the commission of a dangerous felony.  The indictments were consolidated for trial.  A jury found Defendant guilty of simple assault, aggravated burglary, attempted first degree murder, and employing a firearm during the commission of a dangerous felony.  The charge for aggravated assault was dismissed.  Defendant was sentenced to a total effective sentence of twenty-three years.  Between the trial and the hearing on the motion for new trial, the victim signed an affidavit recanting his trial testimony.  The trial court denied the motion for new trial, finding that the victim's recantation was not credible.  On appeal, Defendant challenges the sufficiency of the evidence and the trial court's denial of the motion for new trial.  Because the evidence was sufficient to support the convictions and the trial court did not abuse its discretion in denying the motion for new trial, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Monica Timmerman (on appeal) and Handel Durham (at trial), Memphis, Tennessee, for the appellant, Brian Lackland.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The victim, Corey Selmon, met Danielle Hardrick on Beale Street in Memphis in the summer of 2012. At some point that night, they exchanged numbers. The victim did not hear from Ms. Hardrick until about a month later, on June 27, 2012, when she called him at around 2:00 p.m. As a result of the telephone conversation, the victim made plans to "come out [to the Valley Forge Apartments] and see her later on" that day. The victim went to the apartments around 11:00 p.m. in a rented 2006 Nissan Sentra, a car he was driving after his truck was stolen. He was not entirely sure how to get to the apartment, so Ms. Hardrick told him to call her once he got to "Third Street." The victim did as instructed. Ms. Hardrick gave him directions to the apartment, including telling him where to park.

As the victim approached the closed apartment door, "an individual walked out." The man had a "frown on his face" and was black, "short, about five - - five six, had real bad acne," and appeared to be seventeen or eighteen years old. The victim "turned around to see what was going on, and that's when [he saw a man] with a gun in his hand." The door to the apartment was now open. The victim immediately thought that he was "in danger." Two or three more people "came to the back from behind [the victim] and put guns to [his] back and to [his] head." Later, after talking to police, the victim claimed that there were approximately six people involved. They instructed him to get down on the ground where they stripped him down to his socks and put his shirt over his head. The shirt was not completely covering the victim's face and he was lying on his stomach, so he could still see a little bit of what was happening. "[O]ne guy's pretty much directing the other guys on what to do," telling them to "search the pants pocket" and the car. The victim was wearing diamond earrings worth $500, a ring worth $1200, and had "an Android Cricket phone." He also had $800 in cash he received as payment for painting someone else's vehicle.

The ordeal lasted about five minutes and finally ended when "they told [him] to get up and run to the right." The victim scooped up his pants and other things lying nearby and ran through a field to a gas station near the corner of Third and Michigan where he called the police. It took him about seven minutes to get to the gas station because while he was running away he saw someone "riding around the neighborhood" in a car. The victim was afraid that the occupants of the car were looking for him because at one point they yelled for him to come over to the car. The victim hid behind a garbage can until the "coast was clear."

The victim realized that he had picked up an iPhone that did not belong to him when he picked up his clothes. He did not use the iPhone to call police because he "was ignorant of the fact of how to work an iPhone, and plus, the battery was dead." Once the police arrived, they took the victim back to the apartments so that he could identify where the incident occurred.

Officer Ricky Gray was one of the officers that responded to the call and met the victim at the BP station. He described the victim as "partially clothed" and could see visible bruising on the victim's feet, presumably from running without shoes. Officer Gray took the victim back to the crime scene and did not see any evidence of the robbery. No one answered the door of the apartment. Officer Gray did not recall the victim telling him about finding an iPhone. The victim got a ride home with a family member and eventually had to get a tow truck to move the rental car.

The next day, the victim went to the police station and tried to meet with the detective but was told the detective was not at the office. After the incident, the victim procured a charging cord for the iPhone, powered the phone on, and looked on the Facebook app to see if he could identify anyone involved in the robbery. The victim identified two men that he thought were involved but later realized that there was "a possibility that [he] could have gotten them wrong." The victim returned to meet with the detective a few weeks later in early July. He brought the iPhone he took from the incident to the meeting.

On July 11, 2012, the victim was at home asleep when he awakened to the sound of someone kicking in his back door. It sounded "like a shotgun." The victim got out of bed and walked toward the kitchen, realizing the sound was coming from the back door. The victim ran back to his room and grabbed a bat. He returned to the kitchen and saw an individual he later identified as Defendant "sliding through [his] back door." The victim got about "two feet" away from Defendant, who was dressed in "blue jean shorts, [and a] white T-shirt." As he got closer, Defendant reached in his waistband for something. The victim thought he was reaching for a gun and was going to kill him so he "ran to the back" of the house. The man pulled out a black handgun and fired six or seven shots at the victim. "When the shots ended, [the] victim went out the front door" to a neighbor's house. The victim claimed that he was not staying at his house at the time because he was worried about his safety after the robbery so he had put "his stuff," including his gun, at the house of his neighbor "Tony." The victim left his house, got his "assault rifle" from Tony's house, and ran down the street after the man that broke into the house. The victim called the police. When they arrived, the victim did not tell the police that he chased Defendant with the assault rifle. The victim later identified Defendant as the man that broke into the house and as the man who robbed him back in June. The victim could not recall if he told the police at the time of the break-in at his home that he thought Defendant was the same person who had robbed him in June.

Officer William Forrester responded to the call about the shooting on July 11. When he arrived, he surveyed the scene, noticing that the lower back panel of the back door of the residence was removed. Additionally, there were five shell casings and several bullet strikes in the walls of the home. Officer Forrester did not include any

information in his police report about a prior robbery, the victim's identification of the shooter as the robber, or about the victim getting his gun from the neighbor's house. He did not recall the victim relaying any of this information to him.

Sergeant Kevin Brown was assigned as the case coordinator for both cases. He met with the victim in early July. The victim initially told Sergeant Brown that he thought he had located pictures of two of the men involved on the iPhone he took from the scene. However, Sergeant Brown ascertained that these men were not involved. Sergeant Brown was able to discover a picture that indicated that the phone belonged to Ms. Hardrick. The phone contained pictures of Ms. Hardrick and a text message from "Duke" who was later identified as Defendant. There were also several pictures of Defendant[1] on the iPhone and one picture of Ms. Hardrick and Defendant together. Sergeant Brown actually met with and interviewed Ms. Hardrick prior to the shooting at the victim's home.

The victim explained to police that Defendant could have found his home address in the phone that was stolen on the day of the robbery from a text message where he sent his address to a friend. Sergeant Brown described the victim as being "very scared, very nervous" and that he appeared "shaken up" by the shooting incident at the house. The victim identified Defendant in a photo lineup as the perpetrator of the robbery and the shooting. The victim was also able to identify Ms. Hardrick. Sergeant Brown deemed the victim's identifications credible, despite his original incorrect identifications, based on all the other evidence, including the iPhone that was traced back to Ms. Hardrick, the photographs on the iPhone, and the pictures of Defendant and Ms. Hardrick together.

Defendant and Ms. Hardrick were indicted in September of 2012 for aggravated robbery for the incident occurring at the Valley Forge Apartments. In a separate indictment, Defendant was indicted for aggravated burglary, attempted first degree murder, aggravated assault, and employing a firearm during the commission of a felony for the incident occurring at the victim's home on July 11. Defendant's indictments were consolidated for trial.[2] At the conclusion of the jury trial, Defendant was convicted of simple assault as a lesser included offense of aggravated robbery for the incident occurring at the Valley Forge Apartments. Defendant was found guilty of aggravated burglary, attempted first degree murder, and employing a firearm during the commission

---

[1] Defendant was literally caught with his pants down. One of the pictures on the iPhone was of Defendant sitting on the toilet with his pants around his ankles holding a telephone in his hand. The other pictures on the iPhone of Defendant included one picture of Defendant holding a large stack of one hundred dollar bills in a fan shape in one hand while making some sort of symbol with his other hand and one picture of Defendant with two other men, with one person holding one hundred dollar bills in a fan shape and the other two people making symbols with their hands.

[2] It is not clear from the record what became of the charges against Ms. Hardrick.

of a dangerous felony for the incident occurring at the victim's house. The charge of aggravated assault was nolle prossed.

After trial, the victim swore an affidavit in which he recanted his trial testimony. Specifically, Defendant claimed that he "misidentified" Defendant as the perpetrator and "came across the actual perpetrator of the home invasion . . . at the Wal[m]art." The victim stated that he confronted the perpetrator who "acknowledged his role in the incident, stating that [he] had entered into the wrong house." The victim stated that he was "certain" Defendant was not the person who fired shots at him in his home on July 11.

At the sentencing hearing, the trial court heard evidence from David Willis, the attorney who served as the notary for the affidavit sworn by the victim. In addition, Mario Bradley, a close personal friend of the victim, testified that he accompanied the victim to the office for the notarization of the affidavit. James Johnston, a criminal investigator, testified that he spoke with the victim after trial. The victim indicated that he saw the actual perpetrator at Walmart after trial. When Investigator Johnston asked for a description of the perpetrator so that he could pull surveillance video to identify the man, the victim told him that he could not talk right now. Investigator Johnston asked the victim if he had "been threatened or intimated," but the victim replied "no." The victim eventually told the investigator that the man was wearing shorts, a long-sleeved "hoodie" and a cap inside of the Walmart. Investigator Johnston thought this to be odd because it was 92 degrees outside the day on which the victim claimed this happened. The victim later told the victim/witness coordinator that he saw the perpetrator outside the Walmart, not inside the Walmart. At some point after trial, the victim invoked the Fifth Amendment when asked to testify about the recantation of his testimony.

The trial court sentenced Defendant to an effective sentence of twenty-three years.

Defendant filed a motion for new trial, in part arguing that the victim's recantation required reversal of his convictions under the cancellation rule. Defendant also challenged the sufficiency of the evidence. The trial court held a hearing on the motion, finding that the victim's testimony at trial was "very sincere" but that "when he claimed his Fifth Amendment Right to remain silent that this witness had been gotten to and had been threatened [and] was in fear." There was "not a question in [the trial court's] mind that his recantation was a false recantation under some threat or payment or what I don't know." The trial court denied the motion for new trial. This appeal followed.

*Analysis*

Defendant first challenges the sufficiency of the evidence. Specifically, he argues that the evidence connecting him with the robbery and break-in was "tenuous at best."

Defendant insists that after the victim recanted his testimony, "there was literally no evidence to support the State's theory." The State posits that the jury assessed the credibility of the witnesses, resolved any issues, and determined that Defendant was responsible for the crimes.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

On appeal, Defendant does not challenge with any particularity the State's proof of any of the elements of any of the crimes for which he was convicted. Instead, the gist of the argument made by Defendant is that the victim was not an entirely credible witness. Repeatedly, defendants have been reminded on appeal that the court is not arbiter of the credibility of witnesses or the weight to be given to their testimony. *See e.g.*, *Wagner*, 382 S.W.3d at 297 (quoting *Campbell*, 245 S.W.3d at 335). In fact, even "numerous inconsistencies" in testimony do not serve to undermine a jury's verdict on appeal. *State v. Joseph Cordell Brewer, III*, No. W2014-01347-CCA-R3-CD, 2015 WL 4060103, at *5 (Tenn. Crim. App. June 1, 2015), *no perm. app. filed*; *State v. David Dwayne Smith*, No. E2007-00084-CCA-R3-CD, 2009 WL 230696 (Tenn. Crim. App. Feb. 2, 2009), *perm. app. denied* (Tenn. Aug. 17, 2009); *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) ("[A]lthough inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the

inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt.").

*Recantation of Victim's Testimony*

Defendant urges this Court to determine that the trial court abused its discretion by denying the motion for new trial because the victim's original trial testimony and later recantation of that testimony should amount to an absence of evidence against Defendant under the "cancellation rule." The State disagrees, pointing to the trial court's assessment that the victim's recantation was not credible. The State also argues that the matter is waived because the record does not contain a transcript of a hearing during which the victim was questioned about his recanted testimony.

The transcript from the sentencing hearing references "another case" of Defendant's that was "still open" at the time and "an issue with having the alleged victim testify" where the victim "took the Fifth." Counsel for the State referred to the victim as "unavailable." The trial court stated the following during the sentencing hearing:

> [I]t appears to me from every single thing I've heard about this case that this man was threatened after the trial and was forced to recant his testimony. I put him back on the stand or the Defense did. And I watched absolutely closely every time he testified. And then we brought him back again. I gave him an attorney to give him advice because my opinion at that time was he was clearly committing perjury recanting his testimony.

We were unable to locate a transcript of any proceeding in the record during which the victim invoked the Fifth Amendment. While it is the duty of the Appellant to prepare an adequate record for our review, *see* Tenn. R. App. P. 24(b), and the State argues Defendant has waived the issue for failure to present an adequate record, we find the record complete enough to facilitate our review. The record contains the trial transcript, the affidavit signed by the victim after trial, and testimony from an investigator and the victim/witness coordinator about the victim's recantation. Moreover, the decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967)).

> A new trial may be granted because of recanted testimony when (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*State v. Housler*, 193 S.W.3d 476, 494 (Tenn. 2006) (citing *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn. 1999)). Before a trial court can grant a new trial, it must find that the testimony given by the material witness was false at trial and that the new testimony is true. *See Mixon*, 983 S.W.2d at 673 n.17 (citing *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928)) (other citations omitted).

Here, the trial court made it clear that it did not find the victim's recantation credible. The trial court noted the victim's sincerity during the trial and the "flat affect" of the recantation, even going so far as to speculate that the victim had been threatened or paid to recant his trial testimony. Of course, questions involving the credibility of the witnesses and resolution of conflicts in the evidence are left to the trial court as the trier of fact. *See State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Defendant is not entitled to relief.

Defendant also insists that this Court should apply the rule of cancellation and that the trial court erred in failing to do so. In *State v. Matthews*, a case about the theft of a plow from a barn, the only evidence that the defendant stole the plow from the barn came from the testimony of two witnesses. 888 S.W.2d 446, 448 (Tenn. Crim. App. 1993). The testimony of one of the witnesses, Benny Burrell, implicated the defendant in the crime but, on cross-examination, the witness indicated that he and two other people may have stolen the plow before the defendant was even involved. On redirect, the witness changed his mind, back-pedaling to his first account of the events. On re-cross, his testimony changed again, contradicting his testimony on direct and redirect. This Court explained that "contradictory statements by a witness in connection with the same fact cancel each other." *Id.* at 449 (citing *Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978)). The court quoted the following to explain the situation:

> The question here is not one of the credibility of a witness or of the weight of evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies. But if the proof of the fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way.

*Id.* at 449-50 (quoting *Johnston v. Cincinnati N.O. & T.P. Ry. Co.*, 240 S.W. 429, 436 (Tenn. 1922)). In *Matthews*, the court noted that the inconsistencies in the testimony could be explained and the defendant was not entitled to relief because the rule of cancellation applies only when inconsistency in a witness's testimony is unexplained and

when neither version of his testimony is corroborated by other evidence. *Id.* at 450 (citing *Taylor*, 573 S.W.2d at 483).

Applying *Matthews* to the case herein, we point out that the victim testified consistently at trial that Defendant was the perpetrator. He identified Defendant from the pictures found on the iPhone that he took from the scene of the initial robbery and again when Defendant broke into his house by forcing his way in through the back door. The victim's recantation came after the trial in the matter and was not presented to the jury. Thus, there was no contradictory testimony by the victim at trial that would have rendered the cancellation rule applicable in the first place. Defendant is not entitled to relief.

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE