IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 24, 2019

**STATE OF TENNESSEE v. RICHARD WILLIAMS**

**Appeal from the Criminal Court for Knox County
No. 108261   Steven Wayne Sword, Judge**

_____

**No. E2018-01460-CCA-R3-CD**

_____

Richard Williams, Defendant, was indicted on two counts of attempted first degree murder, one count of attempted first degree murder where the victim suffered serious bodily injury, and two counts of employing a firearm during the commission of a dangerous felony.  Following a jury trial, Defendant was convicted on all counts as charged and received a total effective sentence of thirty-six years in the Tennessee Department of Correction.  On appeal, Defendant challenges the sufficiency of the evidence.  After a thorough review of the record, we affirm the trial court's judgments.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Gerald L. Gulley, Jr. (on appeal), and Kit Rodgers (at trial), Knoxville, Tennessee, for the appellant, Richard Williams.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Phil Morton and TaKisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

*Procedural History*

A Knox County Grand Jury indicted Defendant on the following charges:

| Count | Charge | Victim |
|-------|--------|--------|
| 1 | Attempted First Degree Murder | Larry North |
| 2 | Attempted First Degree Murder Where the Victim Suffers Serious Bodily Injury | Larry North |
| 3 | Employing a Firearm During the Commission of a Dangerous Felony: Attempted First Degree Murder | Larry North |
| 4 | Attempted First Degree Murder | Jamir Greenlee |
| 5 | Employing a Firearm During the Commission of a Dangerous Felony: Attempted First Degree Murder | Jamir Greenlee[1] |

Following a jury trial, Defendant was found guilty as charged on all counts. The trial court merged Defendant's conviction in Count 1 into Count 2. The trial court sentenced Defendant, as a standard Range I offender, to a total effective sentence of thirty-six years to serve.

Defendant filed a timely motion for new trial, which was denied by the trial court. This timely appeal follows.

## *Trial Testimony*

At trial, Michael Alan Mays testified that he worked for the Knox County Emergency Communications District. Mr. Mays explained how a computer-aided dispatch report was generated. A computer-aided dispatch report for a shooting that occurred on April 2, 2016[2], was admitted into evidence. Mr. Mays testified that he prepared a disc of 911 calls related to the shooting. The 911 calls were then admitted into evidence and played for the jury.

Diana Campbell testified that she lived on the fifth floor at Townview Towers apartments ("Townview Towers"), which faced the Vistas Apartments ("Vistas"). Ms. Campbell was watching television in her apartment when she heard about two gunshots on April 2, 2016. When she looked out her balcony, she saw a man who had been shot, lying outside with a child in his arms. Ms. Campbell saw another person run towards Hill Avenue. She heard the man who was lying on the ground yell for help, so she called 911. Ms. Campbell testified that she saw a woman take the child from the man lying on the

---

[1] For purposes of clarity and consistency, we will refer to Jamir Greenlee as "the minor victim" for the remainder of the opinion.

[2] Based on this court's review of the record, there was some variation in the testimony regarding the date of the shooting because it was unclear whether the shooting occurred prior to midnight on April 1, 2016, or after midnight on April 2, 2016.

ground and look after the child until the authorities arrived. Ms. Campbell testified that she heard a total of about ten gunshots. On cross-examination, Ms. Campbell testified that she did not get a good look at the person who fled the scene.

Sharon Gass testified that she lived on the fifth floor at Townview Towers. On April 2, 2016, after Ms. Gass heard about four gunshots, she stepped outside and saw a person pointing a gun at another person and shooting him. As she stepped into her apartment to get her phone to call 911, the shooter fled the scene. Ms. Gass testified that she did not see anyone outside other than the man who was shot and the shooter. On cross-examination, Ms. Gass testified that she did not see if the shooter was a male or female or what the shooter was wearing.

Amy Cardwell testified that she lived on the bottom level of the Vistas in April 2016. The front window of her apartment faced the steps that led up to Townview Towers. On April 2, 2016, Ms. Cardwell heard gunshots and looked outside her window. She saw a person shooting up towards the top of the steps at another person. She saw the shooter stand "there for a good minute and then he slowly actually turned to walk away [with] . . . the gun down by his side." Ms. Cardwell testified that she heard or saw about five or six gunshots. She also testified that she did not see who the man was shooting at because her view was obstructed. After Ms. Cardwell saw the shooter walk away towards Summit Hill Avenue, she went over to the steps while she was on the phone with a 911 operator and saw a man lying on the ground who was bleeding and a little boy standing next to him. On cross-examination, Ms. Cardwell testified that she thought that the shooter was a black male based on his height and how his hands looked.

The victim, Larry North, testified that he had been friends with Defendant, Kipling Colbert, Malik George, and Chris Bassett since high school. Mr. North testified that his relationship with these individuals deteriorated, and they stopped talking to Mr. North after the police had questioned him in December 2015 about an unrelated shooting. Mr. North testified that Defendant stayed at Mr. North's apartment at Townview Towers for about a month or two.

Mr. North testified that Mr. George contacted Mr. North after he left the police station to ask him what he said to the police when the police questioned him in December 2015. Mr. North testified, "I don't remember what I said to [Mr. George] . . . because I've not said one thing to [Mr. George] on the phone that [Mr. George] like flipped, like why do you tell [the police] this and that, [and] . . . [Mr. George] h[u]ng up on me." Mr. North attempted to call Mr. George back twice after Mr. George hung up, but Mr. George did not answer. On the third attempt, Mr. North spoke to Mr. George, who asked Mr. North why he spoke to police. Mr. George also told Mr. North that the two of them were going to have to fight.

Mr. North testified that he sent a video to Mr. Colbert through Snapchat on December 22, 2015, and asked Mr. Colbert, "friend, what you doing" because the two had not talked in a while. Mr. Colbert did not say anything in response, but he sent a video back to Mr. North, and in the video, Mr. Colbert was holding a revolver in his hand. Mr. North testified that he contacted Mr. Colbert again through Snapchat, stating the following in the message:

> [Y]ou're my cousin, I know what you heard was found -- it's way more so I just want you to hear my side, meet me up in the a.m., no speaker, talking about like don't have me on speaker phone, just me and you. It's more than what you all -- you're all family, you're my family and I love you regardless.

In response to Mr. North's message, Mr. Colbert posted the following on Snapchat: "[Mr. North is] staying at Towers. Tell anybody [Mr. Colbert] got him ten bands, to off this n***** if they catch [Mr. North] before [Mr. Colbert] do[es]." Mr. North explained that "Towers" referred to Townview Towers, "ten bands" referred to $10,000, and "off this n*****" referred to getting rid of or killing him. The Snapchat messages were admitted into evidence and shown to the jury.

Mr. North also testified that he does not recall who, but someone called Mr. North a snitch in a post on Facebook prior to the shooting. Mr. North testified that, before the shooting, the last time he had seen Defendant was at a New Year's Eve party with Mr. Colbert on December 31, 2015. Mr. North testified that he had invited Defendant and Mr. Colbert to the party. Mr. North testified that his girlfriend's cousin took possession of two guns from Defendant and Mr. Colbert at the New Year's Eve party because he did not want anybody "to start acting crazy" because people were going to be drinking. Mr. North testified that he did not know the type of the gun that was taken from Defendant. On cross-examination, Mr. North testified that he did not see his girlfriend's cousin take the guns, but his girlfriend's cousin told Mr. North about it at some point during the party.

Mr. North testified that he received a text message from Defendant on the morning of April 1, 2016. In the message, Defendant stated that Mr. North had not talked to his friends in a while and that he and Mr. North had not hung out in a while. Defendant stated that the next time he was in Mr. North's side of town, Defendant would call Mr. North so they could get together. Mr. North and Defendant exchanged messages and spoke on the phone a couple times throughout the day. At the beginning of the text message conversation, Defendant and Mr. North exchanged messages to make a plan to hang out and smoke weed. However, later in the day, Defendant told Mr. North that he needed his duffle bag that he left at Mr. North's apartment from when he was staying

with Mr. North. Mr. North testified that he had Defendant's duffle bag in his apartment and that the duffle bag was filled with Defendant's clothes. Defendant and Mr. North exchanged text messages regarding where to meet in order for Mr. North to give Defendant the duffle bag. At 11:51 p.m., Defendant suggested meeting Mr. North at the steps at Townview Towers that led down towards the street and the Vistas, but Mr. North suggested meeting at the courtyard at Townview Towers. In response, at 11:56 p.m., Defendant stated, "[M]eet me at the steps, bro, that's halfway[.] I'm already out here." Mr. North again suggested the courtyard because the courtyard was a well-lit area and there were balconies in the nearby vicinity with other residents outside. Mr. North testified that he "started feeling fishy about" the meeting at this point because he was worried about getting "ganged." Mr. North testified that he thought if he brought his two-year-old nephew, the minor victim, with him to meet Defendant, Defendant would be less likely to do anything to Mr. North.

Mr. North testified that he left his apartment with Defendant's duffle bag and the minor victim, to meet Defendant at the steps around 11:58 p.m. After Mr. North reached the steps, he took a few steps until he saw Defendant's upper body in a black hoodie. As soon as Mr. North crossed the street to get to the top of the steps, Defendant began shooting at him. Mr. North testified that he immediately pushed his nephew out of the way and then attempted to take off running, but he took one step and "hit the ground." Mr. North testified that he began yelling for help. He also testified that, when he was lying on the ground, he saw an older black lady holding his nephew.

Mr. North testified that he was shot twice in his right calf muscle, once on his left inner thigh, twice on his right inner thigh, once on the front right thigh, once on his hip, and once in his arm, shattering the bone, which required him to get a plate inserted in his arm. Mr. North testified that he was unable to work because the plate placed too much strain on his arm. He also testified that because of the way he landed on his hand when he fell to the ground, he was unable to bend two of his fingers on his dominant hand. A picture of Mr. North and his nephew was shown to the jury to show that his nephew nearly reached Mr. North's waistline. Mr. North marked on the picture to show all of the places he was shot, and it was admitted into evidence. A marked-up map of Townview Towers was also admitted into evidence.

On cross-examination, Mr. North agreed that he testified at the preliminary hearing that he did not see who the shooter was because the shooter had on a black hoodie and there were no lights in the area where he was shot; therefore, he only saw a shadow from the black hoodie the shooter was wearing. On cross-examination at trial, Mr. North testified that he could not identify the face of the shooter. When defense counsel asked Mr. North if it could have been Mr. Colbert who shot him that night, Mr.

North responded, "I don't know. You never know." When asked if it could have been Mr. George, Mr. North responded, "Never know."

Analise Blanchard testified that she was a trauma core nurse at UT Medical Center in April 2016. Ms. Blanchard was the charge nurse when Mr. North was admitted at UT Medical Center on April 2, 2016. Mr. North's vital signs were stable, and he was alert and oriented when he was admitted. Ms. Blanchard testified that gunshot wounds always have the potential to be fatal, whether from direct contact or from a secondary infection.

Officer Jacob Wilson of the Knoxville Police Department ("KPD") testified that he was filling out paperwork in his police cruiser when he heard gunshots on April 2, 2016. Officer Wilson started driving towards Townview Towers before he received a call about a shooting that occurred at Townview Towers. Officer Wilson testified that he was able to arrive at the scene in about thirty seconds because Townview Towers were located across the street from Officer Wilson's location. When Officer Wilson arrived on the scene, he observed Mr. North, who appeared to be conscious, lying face down at the top of the steps that led to the Vistas. On cross-examination, Officer Wilson testified that he did not see the shooter when he arrived at the scene.

Officer Wilson testified that he assisted as other officers attempted to locate Mr. Colbert a few days after the shooting. Organized crime unit officers of the KPD were monitoring surveillance cameras in order to locate Mr. Colbert because he was wanted at the time due to outstanding felony warrants. After the organized crime unit officers observed Mr. Colbert in a vehicle, they requested a marked police cruiser to stop the vehicle. Officer Wilson received the request by radio, and he responded to it. Officer Wilson's cruiser was equipped with video cameras, and he had a video camera on his person as well. The video of the stop was admitted into evidence and played for the jury. There were three individuals in the vehicle, and all three individuals fled the traffic stop on foot towards a nearby park. Officer Wilson chased a person that had been in the back seat of the vehicle, who turned out to be Darrell Sly. Officer Wilson apprehended Mr. Sly on Hazen Street. The driver of the vehicle, Defendant, was apprehended by other officers. The passenger of the vehicle, Mr. Colbert, was not apprehended at the time; however, he later voluntarily showed up at the police department to turn himself in.

Officer Jacob Schettler of the KPD testified that he assisted Officer Wilson and other officers on the traffic stop and foot pursuit on April 4, 2016. Officer Schettler chased Defendant during the foot pursuit, and he apprehended Defendant within 200 yards from the location of the traffic stop. When Officer Schettler searched Defendant, he found a red bandana with eight, nine millimeter bullets in Defendant's pants pocket. Officer Schettler testified that a .38 Special Revolver was recovered that evening in a location that the three individuals crossed during the foot pursuit. Officer Schettler also

testified that another firearm was recovered about a week later after a landscaper found it when he was mowing the lawn in the general area of the foot pursuit. On cross-examination, Officer Schettler testified that he did not see Defendant toss anything during the foot pursuit.

Lucas Shayne McBee testified that he was employed by the City of Knoxville in April 2016, and he mowed the city parks and other areas for the city. Mr. McBee testified that the parks were mowed on a bi-weekly basis. On April 14, 2016, around 7:30 a.m., Mr. McBee began mowing Morningside Park. Mr. McBee was mowing around a bush when he noticed a gun on the ground. Mr. McBee contacted his boss after he found the gun, and his boss contacted the KPD. Mr. McBee testified that he did not notice the gun when he mowed the park two weeks prior, on March 31, 2016. On cross-examination, Mr. McBee testified that he did not know how long the gun had been at that location before he found it.

Officer Jason Boston of the KPD testified that he responded to a call regarding the gun that was found in Morningside Park on April 14, 2016. Officer Boston secured the weapon after the foreman of the mowing crew showed Officer Boston where the gun was found. Officer Boston testified that the gun was loaded when he secured it. Officer Boston called crime scene technician, Officer Russ Whitfield, to the scene.

Officer Whitfield of the forensic unit at the KPD testified that he responded at Morningside Park on April 14, 2016. Officer Whitfield took photographs of the gun and collected it. Officer Whitfield attempted to recover fingerprints off of the gun; however, he was unable to retrieve any viable prints because the gun had "a good amount of rust on it." Officer Whitfield recovered a partial fingerprint off of the magazine that was inside of the gun. Officer Whitfield also swabbed the gun for DNA. Officer Whitfield testified that the gun was a Springfield nine millimeter. He also stated that the gun had probably been outside for about twelve to fourteen days based on information from patrol officers.

Officer Timothy Schade of the forensic unit at the KPD testified as an expert in fingerprint examination. Officer Schade performed a fingerprint analysis for a partial latent print that was recovered from the magazine of the Springfield nine millimeter. Officer Schade determined that there was not enough detail to make an identification.

Special Agent Marla Newport, a forensic scientist at the Tennessee Bureau of Investigation ("TBI"), Knoxville Crime Lab, testified as an expert in the area of forensic biology. Special Agent Newport examined three swabs from the Springfield nine millimeter. Special Agent Newport tested the swabs for touch DNA. No DNA profile was obtained from the swabs of the grip and trigger of the gun. A limited DNA profile was obtained from the swab of the magazine of the gun; however, the limited profile was

available for exclusionary purposes only. Special Agent Newport testified that the comparison that was performed with the standard of Defendant's DNA was inconclusive.

Stephanie Housewright, a crime scene technician at the KPD, testified that she responded to the crime scene in the early morning hours of April 2, 2016, at Townview Towers. After she arrived on the scene, she took photographs of Mr. North, who she found lying on the sidewalk. Ms. Housewright identified photographs that she had taken at the crime scene of Mr. North's injuries, the general location of the crime scene, and all items that were at the crime scene. Ms. Housewright identified eight casings and three bullet fragments that she collected from the scene. She testified that all of the casings were nine millimeter casings. Ms. Housewright testified that she retrieved a bullet fragment from UT Medical Center that was extracted from the victim. Ms. Housewright testified that she also observed a large duffle bag approximately five or six feet from the victim. The duffle bag was retrieved by a family member of the victim.

On April 4, 2016, Ms. Housewright responded to a call to process a scene where the foot pursuit had taken place at Morningside Park. After she arrived, she was told by other officers that they had found some items of evidence they needed photographed and collected. She photographed the .38 Special Revolver that was fully loaded and took possession of it. She also photographed two cell phones that were at the scene and took possession of them as well. Ms. Housewright photographed a bandana with bullets inside of it that the officers found inside Defendant's pocket.

Patricia Resig, a firearms examiner in the forensic unit at the KPD, testified as an expert in firearms examination. Ms. Resig testified that the Springfield nine millimeter that was found at Morningside Park was a semiautomatic pistol that required a separate pull of the trigger after each shot was fired, and the casing was automatically extracted from the chamber and ejected from the gun. She also explained that the gun required a detachable box magazine that contained the live rounds or the cartridges, which would be inserted into the gun in order to fire the gun. Ms. Resig testified that the casings from the scene of the shooting were all Winchester manufactured, nine millimeter Luger caliber. Ms. Resig testified that the casings found at the scene were not fired from the .38 Special Revolver that was found on April 4, 2016. After Ms. Resig examined the eight casings from the scene, she determined that seven out of the eight were fired in the same unknown gun. The eighth casing did not have enough individual characteristics to make such a determination; however, it was probably fired in the same gun as the other seven casings. Ms. Resig testified that the two fired bullet fragments and the one bullet fragment from Mr. North were fired from the same nine millimeter gun.

Ms. Resig testified that she was able to determine that seven out of the eight casings that she examined from the crime scene were fired from the Springfield nine

millimeter that was found at Morningside Park on April 14, 2016, based on her examination of markings on the casings. The eighth casing did not have enough of the characteristics in order for her to make such a determination. Ms. Resig also testified that the two fired bullet fragments and the one bullet fragment that was extracted from Mr. North shared class characteristics and "could have been fired from the same gun."

Based on this proof, the jury found Defendant guilty on all charges.

## II. Analysis

On appeal, Defendant contends that the evidence at trial was insufficient to support his convictions for attempted first degree murder and employing a firearm during the commission of a dangerous felony. The State responds that it provided sufficient evidence for any rational trier of fact to convict Defendant of three counts of attempted first degree murder and two counts of employing a firearm during the commission of a dangerous felony. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2016). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to

be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2016).

A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2016). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2016). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id*. "Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing." *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003) (citing *Suttles*, 30 S.W.3d at 261); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

The identity of the perpetrator is an essential element of any crime and may be proven by circumstantial evidence alone. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002) and *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and "the extent to which the circumstances are consistent with guilt and inconsistent with innocence" are questions for the jury. *Id*. (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

### A. Larry North

#### i. Count 2

Defendant argues that the "State did not produce sufficient evidence that [] Defendant attempted the first[]degree murder of [Mr.] North." The State responds that it provided sufficient evidence for any rational trier of fact to convict Defendant of attempted first degree murder of Mr. North. We agree with the State.

As pertinent here, serious bodily injury is defined as "bodily injury that involves" "[a] substantial risk of death"; "[p]rotracted unconsciousness"; "[e]xtreme physical pain"; "[p]rotracted or obvious disfigurement"; "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(34)(A)-(E) (2016). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2016). This court has held that the subjective nature of pain is a fact to be determined by the trier of fact. *State v. Eric A. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*.

The evidence at trial established that Mr. North and Defendant exchanged messages on April 1, 2016, and they planned to meet in order for Mr. North to give Defendant a duffle bag that Defendant had left at Mr. North's apartment. Defendant insisted on meeting Mr. North at the steps near Townview Towers. Defendant immediately opened fire after Mr. North walked over to the top of the steps with the minor victim. Mr. North immediately pushed the minor victim out of the way after Defendant began shooting. There was no proof presented at trial to show that Mr. North was armed. A rational trier of fact could have determined that Defendant had time to think and premeditate over his actions before he went to the bottom of the steps at Townview Towers and opened fire on Mr. North. Mr. North testified that he was shot twice on his right calf muscle, once on his left inner thigh, twice on his right inner thigh, once on his front right thigh, once on his hip, and once in his arm. The gunshot wound that Mr. North sustained in his arm shattered bone, which required him to get a plate inserted in his arm. Mr. North testified that he was unable to work because the plate placed too much strain on his arm. *See* Tenn. Code Ann. § 39-11-106(a)(34)(C) (2016). Mr. North also testified that because of the way he landed on his hand when he fell to the ground after being shot, he was unable to bend two of his fingers on his dominant hand. *See id*. § 39-11-106(a)(34)(E) (2016). Ms. Cardwell testified that she saw the shooter stand "there for a good minute and then he slowly actually turned to walk away [with] . . . the gun down by his side." There was evidence that a gun, the same gun that was used in the shooting of Mr. North, was found in a park on April 14, 2016, in an area that Defendant crossed while he attempted to flee from the police after a traffic stop on April 4, 2016. Defendant is not entitled to relief.

### a. Identity and the Rule of Cancellation

Defendant additionally argues that Mr. North's testimony was subject to the rule of cancellation because "his critical testimony about the identity of the person who shot at him [was] contradictory, and [should not] [have been] used to support the attempted first-

degree murder conviction." The State responds that because there was additional evidence to support the crimes, this issue is without merit. We agree with the State.

Tennessee courts have recognized the rule of law, commonly referred to as the cancellation rule, "that contradictory [sworn] statements made by a witness as to the same fact can cancel each other out." *State v. Caldwell*, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1997) (citing *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978)). When "the proof of [a] fact lies wholly with one witness, and he both affirms and denies it," then there is no "evidence at all to prove the fact." *State v. Matthews*, 888 S.W.2d 446, 449-50 (Tenn. Crim. App. 1993) (quoting *Johnston v. Cincinnati N.O. & T.P. Ry. Co.*, 240 S.W. 429, 436 (Tenn. 1922)). "However, this rule applies only when inconsistency in a witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence." *Caldwell*, 977 S.W.2d at 118. This court will only disregard testimony "if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon." *Letner v. State*, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) (quoting 23 C.J.S. Criminal Law § 903).

On cross-examination at trial, Mr. North stated that he had testified under oath at the preliminary hearing that he did not see who the shooter was because the shooter had a "black hood on and . . . the area that he was in, it's no lights -- no lighting right there, so with that hood on, you just see like the shadow from the hood and then a black hoodie." However, there is ample evidence that corroborates Mr. North's testimony that Defendant was the shooter. At trial, Mr. North testified that he exchanged text messages with Defendant throughout the day on April 1, 2016. At the beginning of the day, they planned to meet to smoke weed; however after 9:54 p.m. on April 1, 2016, Mr. North and Defendant exchanged text messages to discuss where to meet so Mr. North could give Defendant his duffle bag that Defendant had left at Mr. North's apartment. The last text message exchanged between Mr. North and Defendant was at 11:58 p.m., before Mr. North left his apartment with the minor victim and Defendant's duffle bag to meet Defendant at the steps near Townview Towers that led down to the Vistas. There was no proof presented at trial to show that Defendant attempted to contact Mr. North after the shooting occurred.

In addition, when Officer Schettler apprehended Defendant after a foot pursuit on April 4, 2016, Officer Schettler recovered a red bandana with eight, nine millimeter bullets from Defendant's pants pocket. These bullets matched the bullets that were used in the shooting of Mr. North on April 2, 2016. Furthermore, a Springfield nine millimeter was found on April 14, 2016, in an area that Defendant had crossed while he attempted to flee from the police after the traffic stop on April 4, 2016. Although the DNA found on the gun was inconclusive, Ms. Resig testified that seven out of the eight

- 12 -

casings retrieved from the crime scene were fired from the same Springfield nine millimeter that was found on April 14, 2016. Therefore, although Mr. North's testimony at trial regarding Defendant's identity may have contradicted his testimony from the preliminary hearing, Mr. North's testimony at trial is corroborated by other evidence that is discussed above. The rule of cancellation does not apply and Defendant's identity issue is without merit. Defendant is not entitled to relief.

### b. Intent

Defendant also argues that, even if Defendant was the shooter, the State failed to prove that he intended to kill Mr. North. The State responds that the evidence was sufficient to show that Defendant intended to kill Mr. North because he fired multiple shots at Mr. North. We agree with the State.

The evidence at trial established that Mr. North's relationship with Defendant, Mr. George, Mr. Colbert, and Mr. Bassett deteriorated in December 2015 because Mr. North spoke to the police regarding an unrelated shooting. As a result, the jury could have inferred that Mr. North's friends were disgruntled with him because they stopped communicating with him. Furthermore, the State presented evidence that Mr. George and Mr. Colbert threatened Mr. North for talking to the police. There was no evidence that Mr. North was armed during the offenses, so the jury could have inferred that Defendant used a deadly weapon against an unarmed victim. The evidence at trial established that Mr. North was shot twice on his right calf muscle, once on his left inner thigh, twice on his right inner thigh, once on his front right thigh, once on his hip, and once in his arm. In addition, Ms. Cardwell testified that she saw the shooter stand "there for a good minute and then he slowly actually turned to walk away [with] . . . the gun down by his side." There was evidence that the gun that was used in the shooting of Mr. North was found in a park on April 14, 2016, in an area that Defendant crossed while he attempted to flee from the police after the traffic stop on April 4, 2016. The jury could have inferred that Defendant disposed of the gun after the shooting, which could indicate an effort to conceal the crime. Therefore, there were multiple factors—the use of a deadly weapon upon an unarmed victim; motive to kill; multiple gunshot injuries; and calmness immediately after the shooting—that supported a finding that Defendant acted intentionally and in a premeditated manner. In sum, the abovementioned evidence was sufficient for any rational trier of fact to find that Defendant acted with premeditated intent to kill Mr. North. Defendant is not entitled to relief.

### ii. Employing a Firearm during the Commission of a Dangerous Felony

Defendant argues that if Defendant's attempted first degree murder conviction cannot be sustained, his conviction of employing a firearm during the commission of a

dangerous felony has "no underlying legal predicate." The State responds that the evidence was sufficient to sustain Defendant's conviction of employing a firearm during the commission of a dangerous felony. We agree with the State.

"It is an offense to employ a firearm during the[] . . . [c]omission of a dangerous felony[.]" Tenn. Code. Ann. § 39-17-1324(b)(1) (2016). Attempt to commit first degree murder is a "dangerous felony." Tenn. Code Ann. § 39-17-1324(i)(1)(A) (2016). The term "employ" means "to make use of." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014).

The proof at trial established that Defendant came to the bottom of the steps near Townview Towers with a Springfield nine millimeter and shot Mr. North eight times. Furthermore, because Defendant's challenge to the sufficiency of the evidence supporting the underlying conviction of employing a firearm during the commission of a dangerous felony hinges entirely on the sufficiency of the attempted first degree murder convictions, this court concludes that the evidence is sufficient to support that conviction as well. Defendant is not entitled to relief.

### B. The minor victim

### i. Attempted First Degree Murder

Defendant argues that, even if Defendant was the shooter, the State failed to prove that he intended to kill the minor victim. The State argues that the evidence was sufficient to show that, by firing multiple shots at Mr. North and the minor victim, "[Defendant's] actions showed an intent to kill both victims." We agree with the State.

In *Millen v. State*, our supreme court concluded that the common law doctrine of transferred intent, which provides that "a defendant who intends to kill a specific victim but instead strikes and kills a bystander is deemed guilty of the offense that would have been committed had the defendant killed the intended victim[,]" 988 S.W.2d 164, 166 (Tenn. 1999) (citing 2 Charles E. Torcia, *Wharton's Criminal Law* § 146 (15th ed.1994); 1 Wayne R. LaFave & Austin W. Scott Jr., *Substantive Criminal Law* § 3.12(d) (1986)), "has little application under modern statutory law." *Millen*, 988 S.W.2d at 167. Our supreme court held that "if the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder." *Id.* at 168.

This court has expanded the ruling in *Millen* to convictions of attempted first degree murder and attempted second degree murder, concluding that the reasoning in

- 14 -

*Millen* applies to those offenses as well. *See State v. Corderro Avant and Davario Fields,* No. W2018-01154-CCA-R3-CD, 2019 WL 3072131, at *18 (Tenn. Crim. App. July 12, 2019) (concluding that there was sufficient evidence for a rational trier of fact to find the defendants guilty of attempted first degree murder when the defendants fired shots into a home with the intent to kill when there were victims inside of the home), *no perm. app. filed*; *State v. Samuel Glass*, No. E2012-01699-CCA-R3-CD, 2013 WL 4677654, at *11-13 (Tenn. Crim. App. Aug. 28, 2013), *perm. app. denied* (Tenn. Dec. 26, 2013); *State v. Fabian Claxton*, No. W2009-01679-CCA-R3-CD, 2011 WL 807459, at *6-7 (Tenn. Crim. App. Mar. 7, 2011), *no perm. app. filed*; *State v. Tarrence Parham*, No. W2009-00709-CCA-R3-CD, 2010 WL 2898785, at *11 (Tenn. Crim. App. July 26, 2010), *perm. app. denied* (Tenn. Nov. 10, 2010); *State v. Horace Demon Pulliam*, No. M2001-00417-CCA-R3-CD, 2002 WL 122928, at *5 (Tenn. Crim. App. Jan. 23, 2002), *perm. app. denied* (Tenn. May 28, 2002).

When viewed in the light most favorable to the State, the evidence was sufficient for any rational trier of fact to find Defendant guilty of attempted first degree murder of the minor victim. The proof at trial established that Mr. North walked over to the steps near Townview Towers with the minor victim to meet Defendant. Mr. North testified that the minor victim was with him during the shooting and that he pushed the minor victim out of the way immediately after Defendant began shooting. The proof showed that Defendant intentionally fired eight shots in the general direction of the minor victim, who moments earlier walked alongside Mr. North to the steps near Townview Towers to meet Defendant. Although the minor victim did not sustain any injuries from the shooting, Mr. North was shot eight times and he sustained all of the injuries within a very short time period. Because Defendant's intent of attempted first degree murder is clear as to Mr. North, we conclude that the proof is sufficient for conviction of attempted first degree murder of the minor victim. Defendant is not entitled to relief.

### ii. Employing a Firearm during the Commission of a Dangerous Felony

Defendant argues that if Defendant's attempted first degree murder of the minor victim cannot be sustained, his related conviction of employing a firearm during the commission of a dangerous felony has "no underlying legal predicate." The State responds that the evidence was sufficient to sustain Defendant's conviction of employing a firearm during the commission of a dangerous felony. We agree with the State.

We have previously set out the statutes and case law applicable to this offense. The proof presented at trial established that Defendant showed up to the bottom of the steps near Townview Towers with a Springfield nine millimeter and intentionally fired eight shots in the general direction of the minor victim, who moments earlier had walked alongside Mr. North to the top of the steps. Furthermore, because Defendant's challenge

- 15 -

to the sufficiency of the evidence supporting the underlying conviction of employing a firearm during the commission of a dangerous felony hinges entirely on the sufficiency of the attempted first degree murder convictions, this court concludes that the evidence is sufficient to support that conviction as well.  Defendant is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE