IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 18, 2021

**STATE OF TENNESSEE v. ANTHONY LEBRON VANCE**

**Appeal from the Criminal Court for Hamilton County**
**No. 304410    Don Poole, Judge**

_____

**No. E2020-00467-CCA-R3-CD**

_____

The Defendant, Anthony Lebron Vance, was convicted by a Hamilton County Criminal Court jury of rape, a Class B felony. *See* T.C.A. § 39-13-503 (2018). The trial court sentenced him to twenty-five years at 100% and imposed the sentence consecutively to the Defendant's ten-year sentence in another case. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred in imposing consecutive sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Michael L. Acuff (at trial and on appeal) and William Christopher Dixon (at trial), Chattanooga, Tennessee, for the Appellant, Anthony Lebron Vance.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; Andrew Coyle and Miram Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction relates to a January 3, 2018 sexual assault, which occurred as the victim walked home from a bus stop. In addition to the victim's testimony, GPS information and DNA analysis results connected the Defendant to the crime.

At the trial, the victim testified that the Defendant approached her after she disembarked from a bus around 6:53 to 6:57 a.m. She said the Defendant asked her name, asked if she wanted money, and asked if she wanted drugs. She said she understood the Defendant was offering money and drugs in exchange for something. She said that she

declined money and drugs and that she was not a prostitute. She said she was wary of the Defendant, whom she did not know. As the victim continued walking, the Defendant walked with her and asked questions about the bus routes and bus station. She said she walked past her house because she did not want the Defendant to know where she lived. She said she walked with the Defendant to show him how to find the bus station. She said that after she directed the Defendant to the bus station, he attacked her from behind, put a jacket over her head, hit her, and knocked her to the ground after she screamed. She said she removed the jacket and left it "so someone can see it." She said that the Defendant had a shiny object "on him," that she did not know what it was, and that he stated he had a weapon. She said she tried to pick up a stick, which the Defendant knocked from her hand. She said the Defendant told her that he would kill her if she screamed. She said she pleaded for her life, that she told the Defendant she "would do anything," and that the Defendant said he wanted anal sex, which she said she refused. The victim stated that she continued to plead for her life and that the Defendant said he wanted oral sex. She said she did not run because she feared for her life.

The victim testified that the attack occurred in a field behind a duplex. She said the Defendant forced her to lie down and removed her clothes. She said he told her that if she screamed, he would kill her and her family. She said he forced his penis into her mouth. She said the assault continued for about twenty minutes, until two cars drove by, and that the Defendant went into some bushes and acted as if he were talking on a cell phone as the car passed. She said that after the cars passed, the Defendant returned, digitally penetrated her vagina, penetrated her vagina with his penis, and sucked her breasts. She said the digital penetration was painful because the Defendant scratched her vaginal tissue and forced himself inside her. She said the Defendant kissed her and forced his tongue down her throat.

The victim testified the Defendant ended the attack when cars drove past and a neighbor came outside. She thought the neighbor saw the Defendant. She said the Defendant got dressed and helped her get dressed. She said the Defendant asked her for forgiveness and asked her to pray with him but that she declined. She said she was having asthma and panic attacks at this point, that she coughed up blood, that the Defendant told her to "shut up," and that the Defendant got her inhaler and gave it to her. She said the Defendant took her work identification badge.

The victim testified that the Defendant prayed. She said she and the Defendant walked to the neighbor. She said the Defendant stated that he did not mind if the neighbor or the victim called the police or an ambulance but to give the Defendant ten minutes to get away. She said the Defendant identified himself as "Tony." The victim said she was taken to a hospital by ambulance, where she was admitted for a seven-day stay.

The victim testified that the Defendant wore beige pants, a white shirt with brown stripes, a black or blue jacket, and a black or blue toboggan. She said he had a facial scar and smelled like he had been drinking alcohol.

The victim testified that she identified the Defendant in a photograph lineup and said she would never forget his face, scar, and clothing. She identified the photograph of the Defendant that she had identified in the photograph lineup, and the photograph was received as an exhibit.

The victim agreed that she screamed twice during the assault. She agreed the assault lasted longer than one to two minutes, that it might have been as long as twenty minutes, and that passersby would have been able to see the Defendant standing as he pretended to talk on a cell phone. She said, however, that they would have been unable to see her because she was on the ground. When asked if her memory about the relevant events was poor, she responded, "This been a while." When asked if she had mentioned in her previous testimony that a second car passed by during the attack, she said she did not recall how many cars had passed but that she remembered hearing cars. She agreed that she had given two accounts regarding her work identification card by stating on one occasion that the Defendant saw the card when it "fell out" and on another occasion that the Defendant grabbed the card. She agreed that upon the Defendant's seeing the card, he stated, "I'm sorry, you not the person that I supposed to kill, the gang members sent me after the person that stole the dope money, or whatever." She agreed that the Defendant found her inhaler, gave it to her, and walked her to the neighbor after apologizing to her. Regarding her prior statements and testimony, the victim acknowledged that she sometimes had difficulty understanding what the attorneys asked her. She said she did not enjoy reliving the assault.

Jerry Davis, who lived near the location where the assault occurred, testified that he was outside early on the morning of January 3, 2018, when he saw a man and a woman dusting themselves off about twenty feet away. He said that they approached him, that the woman had a bloody nose and stated she was having an asthma attack, that Mr. Davis said he was going to call an ambulance, and that the man said not to call the police because he was a "gang banger." Mr. Davis said the victim, with whom he had spoken before the day of the incident, seemed scared. He said the man ran away when Mr. Davis's daughter called the police. Mr. Davis identified the man he saw that morning as the Defendant.

Chattanooga Police Investigator Damarise Goehring testified that she interviewed the victim at the hospital. She said the victim described her assailant as an older, black man with a scar on his face who wore a white shirt with brown stripes and khaki pants. She said the victim appeared shaken. Investigator Goehring said the victim later identified the Defendant in a photograph lineup. Investigator Goehring said she and Investigator Williams searched the scene and did not locate any evidence.

Investigator Goehring testified that she and Investigator Williams interviewed the Defendant. A recording of the interview was played for the jury, and in it, the Defendant stated the following: On the night of January 2, 2018, he stayed overnight at "the kitchen." On January 3, 2018, he woke at 5:00 a.m. and cleaned inside and outside the kitchen, ate breakfast at 7:00 a.m., and went to the Homeless Health Clinic across the street from the kitchen around 9:00 a.m. When asked if he had visited his mother on January 3, he said he had not been to his mother's house in about two weeks. He did not recall riding a bus or getting a ride to the area near a recreation center on January 3. He said he had an appointment at the health center in the same area on January 3 but that he did not go to it because he was on another side of town. When asked what he would say if he were told someone saw him walking on the morning of January 3 in the area which other evidence showed was where the attack occurred, he said he had not been there and had been "in this side of town." He said he did not remember talking to a young woman on the sidewalk in the area which other evidence showed was where the attack occurred. When shown a photograph of himself wearing a jacket and when told someone saw him in the area where the attack occurred on the morning of January 3, he said he had not been there. He did not remember talking to a young woman who got off a bus and said he was being mistaken for someone else. He said he did not follow a young woman, drag her behind a house, and rape her. He said cameras at the kitchen would show his presence at the kitchen around 6:30 a.m. on January 3. When told that the young woman had reported the Defendant's having threatened to return and hurt her, he said, "I'm not no gang affiliated. I don't make threats." The recording reflects that the officers had not mentioned gang affiliation before the Defendant mentioned it. When shown a photograph and asked if he knew the woman depicted in it, the Defendant said he did not know her and denied he had talked to her on January 3. He said there would be no reason for his DNA to be on the woman's body. When asked repeatedly about the woman's knowing he was known as "Tony," the Defendant stated that many people called him Tony. He said he did not ride the bus because his "girl" had a car. He said he did not have a bus schedule in his pocket on January 3. When told a bus schedule with a notation of his January 3 appointment at the health center had been found on the ground where the woman had been attacked, he said, "No," and encouraged the officers to check the video recordings from the kitchen.

State of Tennessee employee Evo Efiom testified that, as part of his job duties, he had given the Defendant a GPS monitor. Regarding the Defendant's whereabouts from 7:02 until 8:17 a.m. on January 3, 2018, Mr. Efiom stated that the Defendant had been in the vicinity of the 1300 block of Sheridan Avenue, with tracking points on the corner of Sheridan and Wilson. Other evidence showed that this was the area in which the victim was assaulted.

Rape Crisis Center employee Lee Preston testified as an expert sexual assault nurse examiner. She stated that she met with the victim at the hospital, where Ms. Preston

performed a forensic examination and created a report and "traumagram" with the victim's assistance. Ms. Preston described the victim as appearing to be in pain and traumatized.

Ms. Preston testified that the victim reported she last had consensual sex three to five days before the rape. The victim rated her pain from an asthma attack as an eight out of ten. She reported that the perpetrator's penis and fingers penetrated her vagina, that the perpetrator's penis penetrated her mouth, and that the Defendant kissed her and sucked her left nipple. The victim reported that she had been strangled and had "suffered a cardiac event" during the attack. The victim stated the strangulation precipitated an asthma attack. The victim was unsure if the perpetrator ejaculated.

Ms. Preston testified that upon physical examination, the victim was tender upon touch to her face, neck, mouth, cheekbone, and temple. The victim's right upper back was red, and she had an abrasion on her right upper buttock. She had pain in her hips and upper legs from the perpetrator's having sat on her by pressing his legs into her upper legs. Ms. Preston said the speculum exam caused the victim to cry out in pain. Ms. Preston said that she did not photograph the victim internally due to the victim's pain and that the victim had active vaginal bleeding that was not attributable to menstruation. Ms. Preston said bleeding was unusual from a sexual assault. Ms. Preston said she also combed the victim's pubic hair and swabbed various parts of the victim's body for evidence. Ms. Preston stated that the victim's injuries were recent and were consistent with the victim's account of the rape.

Tennessee Bureau of Investigation (TBI) special agent forensic scientist, Dr. Laura Boos, testified as an expert in forensic biology that she examined evidence collected in this case. She said the vaginal, oral, and external genital swabs tested negative for the presence of sperm. She said the left nipple swab tested positive for the presence of saliva. Upon further testing, she determined that the swab contained the DNA of at least three individuals, at least one of whom was male. She conducted further testing of the swab and determined that the Defendant's DNA was consistent with that of the major contributor.

The defense elected not to present evidence. The jury found the Defendant guilty of the charged offense of rape.

At the sentencing hearing,[1] the trial court received as exhibits certified copies of the judgment forms for the Defendant's prior convictions for attempted aggravated burglary,

---

[1] The trial court also considered the pending probation violation warrant related to the Defendant's prior rape conviction during the first of two hearings related to sentencing. The court revoked probation and

-5-

burglary of a business, robbery, burglary, aggravated assault, and rape. The rape judgment reflected that the Defendant was serving a ten-year enhanced probation sentence at the time of the present offense.

The presentence report, which was received as an exhibit, reflected that the Defendant was fifty-six years old at the time of sentencing. The Defendant told the presentence report preparer that he had been wrong to try to trick the victim into having sex with him for $100, despite the fact he did not have $100. The victim provided a written statement to the report preparer, in which the victim stated that she was still fearful, that she was receiving counseling as a result of the rape, and that she was financially burdened by the resulting costs of medical treatment, counseling, and associated transportation. The Defendant had an extensive history of criminal convictions beginning at age eighteen and spanning his adult life. He had multiple past probation violations. The Defendant claimed to be a member of the Crips criminal street gang, but law enforcement records did not support his claim. The Defendant reported that he had completed the required high school graduation credits but that he never obtained his diploma. He reported fair physical and mental health, having been diagnosed with bipolar disorder and schizoaffective disorder, and a history of psychiatric hospitalizations. He received Social Security disability benefits related to his mental health diagnosis. The Defendant reported frequent use of alcohol and marijuana, both of which began in his teenage years, until his incarceration. He reported that he had been under the influence of alcohol at the time he committed the offense in the present case.

The Strong-R risk assessment report, which was incorporated by reference into the presentence report, stated that the Defendant was a "predatory adult sexual offender, opportunistic type," who had a high risk of reoffending. The Defendant reported having tricked the victim into having sex in exchange for $100 but failing to pay her. He reported that he had employed this ruse "100's of times," but he also reported a sexual history of twenty-five partners, of whom he had "tricked" approximately twenty into having sex.

A document authored by the victim was received as an exhibit. In it, she stated that, in her opinion, the Defendant was a danger to society and should be incarcerated for the rest of his life.

Julia Vance, the Defendant's mother, testified that the Defendant had lived with her for most of his life and that he could return to live with her once he was no longer incarcerated. She said he had been a good child and had attended church throughout his life, including when he was incarcerated. She said that he had worked for periods of one

---

ordered the Defendant to serve the balance of his ten-year sentence.

year or less until he obtained Social Security benefits and that he had been ordained as a minister about ten years ago. She said he had done volunteer work at Community Kitchen.

After receiving the proof relative to sentencing, the trial court found that the Defendant was entitled to mitigation based upon the evidence of his mental health issues. *See* T.C.A. § 40-35-113(8) (2019) ("The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense; however, the voluntary use of intoxicants does not fall within the purview of this factor[.]"). The court found relative to enhancement that the Defendant had a lengthy criminal history and that he failed to comply with the terms of the sentence of probation he was serving at the time of the offense. *See id.* § 40-35-114(1) (2019) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"), -114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]"), -114(13)(C) (the defendant was released on probation at the time he committed the offense). The court relied upon the Defendant's having been on probation at the time of the offense as its basis for imposing consecutive sentencing. *See id.* § 40-35-115(b)(6) (2019) ("The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is sentenced for an offense committed while on probation[.]"). The court found that the Defendant's prognosis for rehabilitation was poor and that his risk of reoffending was high.

As a Range III offender, the Defendant faced a sentence of twenty to thirty years for his Class B felony conviction. *See id.* § 40-35-112(c)(2) (2019). The court imposed a mid-range-sentence of twenty-five years and ordered that the Defendant serve his sentence consecutively to the sentence for his previous rape conviction, yielding an effective thirty-five-year sentence for the combined sentences. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the rule of cancellation applies to the victim's testimony, which he characterizes as contradictory. The State counters that the evidence is sufficient because the victim's account of a sexual assault is not contradictory and that it is corroborated by other evidence. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

-7-

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

As relevant to this case, rape is unlawful sexual penetration of a victim by a defendant accompanied by force or coercion to accomplish the act or without the victim's consent where the defendant knows or has reason to know the victim did not consent at the time of penetration. T.C.A. § 39-13-503(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id.* § 39-13-501(7) (2018).

The Defendant's argument regarding the victim's credibility focuses on purported inconsistencies in her testimony regarding where she walked while talking with the Defendant before the rape, whether she could see the Defendant at one point, and when the Defendant first exposed his penis. The Defendant also argues that the victim's testimony is "difficult to parse out and understand" regarding how the rape began. He argues, as well, that the victim's testimony was uncorroborated as to her having left a coat at the scene and as to having screamed twice. He also posits that the victim's claim she walked past her house before the attack is implausible, given that she could have escaped to safety if she had been wary of the Defendant, as she claimed. The Defendant further argues that the victim's testimony is implausible regarding her account that (1) he stopped the attack after seeing her identification card and claiming she was not the person gang bangers had sent him to kill, (2) the Defendant twice interrupted the rape to dress, stand, and pretend to talk on a cell phone, and (3) the rape took place over an extended period of time, yet it was not observed by any witnesses.

"[C]ontradictory statements by a witness in connection with the same fact cancel each other." *State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993); *see Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978). The rule of cancellation comes into play "only when the inconsistency in a witness' testimony is unexplained and when neither version of [the] testimony is corroborated by other evidence." *Matthews*, 888 S.W.2d at 450 (citing *Taylor*, 573 S.W.2d at 483).

As we have stated, it is not the function of this court to invade the province of the trier of fact by reassessing witness credibility. *See Bland*, 958 S.W.2d at 659 (Tenn. 1997); *see Sheffield*, 676 S.W.2d at 547. The victim testified that, at times, she was confused by the attorneys' language and had difficulty understanding their questions. The Defendant's focus on parts of her testimony must not be considered in isolation. Rather, we view her testimony in its overall context. In that regard, she provided an account of a sexual assault occurring after the Defendant approached her with questions about buses and the bus station and then attacked her and took her behind a residence to perpetrate his attack. Her account of a non-consensual sexual encounter was corroborated by the forensic examination, which included findings of tenderness on palpation of several parts of her body, blood from her vagina, and significant pain upon vaginal examination. The Defendant's DNA was found on her breast. We note, as well, that the defense's cross-examination of the victim regarding the location in which various relevant events occurred was less than straightforward, which supports the victim's testimony that she had difficulty understanding what the attorneys asked of her at times. When questioned by the police, the Defendant denied that he had been in the area where the victim was attacked, but GPS data showed that he had been in the area of the attack. Mr. Davis testified that the Defendant told him not to call the police and that the Defendant claimed to be a gang member, the latter of which is consistent with the victim's account of the Defendant's having claimed to have been sent to kill someone on behalf of gang members.

Viewed in the light most favorable to the State, the record reflects that the Defendant approached the victim on the street and began a conversation with her. The victim attempted to help the Defendant with his questions. The Defendant offered drugs and money, which the victim declined. The Defendant attacked the victim, moved her to a location behind a residence, and sexually penetrated her. The victim did not consent to sexual penetration. In addition, the Defendant used force to accomplish the attack. After the attack, the Defendant apologized and claimed he had been sent to kill someone but that he had targeted the wrong person. The Defendant fled the scene when Mr. Davis's daughter called 9-1-1. The evidence is sufficient to support the Defendant's rape conviction. He is not entitled to relief on this basis.

## II

## Consecutive Sentencing

The Defendant contends that the trial court erred in imposing his twenty-five-year sentence consecutively to the ten-year sentence he was serving following the court's revocation of his probation for the previous conviction. The State counters that the court did not abuse its discretion. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The Defendant argues that a thirty-five-year effective sentence, based upon his twenty-five-year sentence in the present case imposed consecutively to his prior ten-year sentence, is too harsh because it is an effective life sentence for him, given his age and the fact that he can earn no more than 15% behavioral credits toward early release. He does not challenge any enhancement factors relied upon by the trial court as being unsupported by the evidence in arriving at the twenty-five-year sentence for the present conviction. Likewise, he does not challenge the court's finding that he was on probation at the time he committed the present offense, which formed the basis for consecutive sentencing.

As the appealing party, the Defendant bears the burden of demonstrating that the sentence imposed was improper. *See* T.C.A. § 40-35-401 (2019) (Sent'g Comm'n Cmts.). The record reflects that the trial court relied upon the Defendant's commission of the present rape while on probation for rape as the basis for consecutive sentencing. *See id*. § 40-35-115(b)(6). The Defendant has an abysmal criminal history, which spans his entire adult life, and past periods of incarceration and supervision have failed to correct his continued disregard for the law. By his own admission, he is a sexual predator. Upon review, we conclude that the trial court did not abuse its discretion in imposing consecutive sentencing. The record supports the court's conclusion that an effective thirty-five-year sentence is no greater than that deserved for the Defendant's offenses and is the least severe measure necessary to achieve the purposes underlying the sentence. *See id*. § 40-35-103(2), (4); *Desirey*, 909 S.W.2d at 33. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE